# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

CITIZENS BANKING CORP.,

      Plaintiff,                         Case Number: 07-11514

v.                                   Hon. Arthur J. Tarnow
                                        Magistrate Judge: Donald A. Scheer

CITIZENS FINANCIAL GROUP,
INC., *et al.*,

      Defendants,

_____/

## OPINION AND ORDER FOLLOWING BENCH TRIAL

This trademark infringement suit was heard at a six-day bench trial, commencing on February 5, 2008. For the reasons explained below, Plaintiff's request for injunctive and other relief is DENIED. The Court's findings of fact and conclusions of law follow.

## I. INTRODUCTION

### A. Factual Background

Plaintiff Citizens Banking Corporation ("CBC") has used a "Citizens"-related mark in Michigan since it was established in Flint in 1871. It currently operates approximately 160 branches in 42 counties in Michigan. CBC is the largest bank headquartered in Michigan, and is the seventh largest bank operating in the state. It has used the name "Citizens Bank" since 1995.

Plaintiff has grown significantly in just the last few years. It expanded its Oakland County business in late November 2003. It purchased Republic Bank in

December 2006, which increased its coverage area in Michigan, as well as other states. For instance, until that acquisition, Plaintiff had no branches in Washtenaw, Monroe, and Livingston counties. Plaintiff re-branded all Republic Banks in Michigan with its "Citizens Bank" mark.

In addition to its operations in Michigan, Plaintiff extended its reach into Wisconsin, Iowa, and Ohio with the purchase of F&M bank. F&M branches in Wisconsin and Ohio were re-branded to "Citizens Banks," despite the presence of other "Citizens" named banks in the same areas. The Republic Bank branches in Ohio were also re-branded, which was the subject of Defendant's counter-claim.

Defendant Citizens Financial Group ("CFG") has also been in operation since 1871, as a "Citizens"-named bank. It currently operates approximately 1600 branches in thirteen states, and is the eighth largest commercial banking company in the United States. Since 1988, CFG has been a wholly owned subsidiary of Defendant Royal Bank of Scotland ("RBS").

In 1976, CFG began to use a stylized "C" as its logo, which is also known as the "Pacman" logo. In 2005, CFG transitioned from the Pacman to its current logo, known both as the "snowflake" or the "daisy wheel." The daisy wheel was adopted from the logo of the parent company, RBS.

In 2000, CFG was operating in only four states in New England. Since at least the mid-1990s, CFG had been acquiring banks. With each acquisition, CFG changed the purchased bank's name to "Citizens Bank," accompanied by the current logo in use. In 2000, CFG purchased Mellon Bank, which expanded its footprint to three

more states.  In 2004, it acquired Charter One, which had branches in Michigan, Ohio, and four other states.  CFG's intent is to rebrand its entire "footprint" (its banks in all thirteen states) to the name "RBS Citizens," an effort projected to cost $350 million.

Plaintiff currently uses the following marks:



D e f e ndant seeks to re-brand its Charter One branches (actually, its whole "footprint") with the following marks:

 

## B.  Procedural History

Plaintiff filed this action in April 2007, on becoming aware of Defendants' rebranding plan for Charter One.  The action seeks declaratory judgment and injunctive relief, to prevent Defendants from using a "Citizens" mark in Michigan. Defendants counterclaimed to prevent Plaintiff from using the "Citizens" mark in Ohio, where Plaintiff planned to re-brand branches of Republic Bank.

Pursuant to a January 14, 2008, teleconference, this trial was limited to the parties' use of the marks in Michigan.  For trial, the issues were limited further to only nine counties in Michigan in which the parties would be the only "Citizens" named banks.  Those counties are Ingham, Jackson, Livingston, Monroe, Oakland, Saginaw,

Shiawassee, Washtenaw, and Wayne.

A bench trial was held from February 5 to 12, 2008 before this Court.

Summary judgment motions remain outstanding on Defendants' counterclaim as to Plaintiff's use of the mark in Ohio.

## II.  ANALYSIS

For Plaintiff to prevail in a trademark infringement action, it must demonstrate

> (1) ownership of a specific service mark in connection with specific services; (2) continuous use of the service mark; (3) establishment of secondary meaning if the mark is descriptive; and (4) a likelihood of confusion amongst consumers due to the contemporaneous use of the parties' service marks in connection with the parties' respective services.

*Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1105 (6th Cir. 1991).  As explained further below, the Court need make no finding as to ownership or use, because the Plaintiff has demonstrated neither secondary meaning nor, most importantly, a likelihood of confusion.

### A.  Plaintiff's mark is descriptive

"[W]hether Plaintiff's mark qualifies for trademark protection is determined by where the mark falls along the established spectrum of distinctiveness." *DeGidio v. West Group Corp.*, 355 F.3d 506, 510 (6th Cir. 2004) (citation omitted).  In order of increasing protection afforded, that spectrum covers "(1) generic terms; (2) descriptive; (3) suggestive; (4) arbitrary or fanciful." *Id.*  Suggestive or arbitrary terms are considered inherently distinctive. *Id.*

"A suggestive term suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception

to determine the nature of the goods." *Id.* (quoting *Induct-O-Matic v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984)).  A descriptive term by contrast describes one or more of the following: "the intended purpose, function or use of the goods . . . the class of users of the goods; a desirable characteristic of the goods; or the end effect upon the user." *Id.* (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1190 (6th Cir.1988)).

Plaintiff cites the United States Patent and Trademark Office's approval of trademark applications with the term "Citizens" as evidence that the mark is distinctive.  Indeed,

> the PTO requires an applicant to demonstrate that its mark is distinctive before it will approve a registration.  Courts frequently have accorded weight to these kinds of PTO determinations in evaluating whether a mark is descriptive or inherently distinctive.

*Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 119 (1st Cir. 2006) (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 934 (4th Cir.1995)).  However, the resulting presumption "is not conclusive." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1118 (6th Cir. 1996). In *Champions*, the court observed that despite PTO registration without demonstration of secondary meaning, "other courts have treated a mark of 'CHAMPION' as weak, and 'entitled to but a very limited scope of protection.'" *Id.*  (citations omitted).

In addition, "[f]requent use of a term by sellers of similar products or services tends to indicate that the term is descriptive or generic rather than suggestive." *Dranoff-Perlstein Assocs. v. Sklar*, 967 F.2d 852, 858 (3d Cir. 1992) (citing *Security Ctr., Ltd. v. First Nat'l Security Ctrs.*, 750 F.2d 1295, 1299 (5th Cir.1985)).  Here,

Plaintiff's use of the term "Citizens" must be considered in context with the hundreds of national banks and financial service providers.

Similarly, in part because of the widespread nature of the term's use, the term "Citizens" has been found in this District to be only descriptive, in a prior suit brought by Plaintiff. *See Citizens Banking Corp.,et al., v. CNB Bancshares, Inc.*, No. 98-74195, *slip op.* at 5 (E.D.Mich. Dec. 23, 1998) (Duggan, J.). *Cf. Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 123 (3d Cir. 2004) (permitting a jury determination of distinctiveness to stand, but finding that "as a general rule, widespread use of even a distinctive mark may weaken the mark.")

Because of that frequent use of the term, and agreeing with the reasoning in *Citizens Banking Corp. v. CNB*, the Court finds Plaintiff's use of the term "Citizens" to be descriptive.

## B. Plaintiff has not demonstrated secondary meaning

If a term is found to be descriptive, secondary meaning must be proven for the term to be protectable. *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 761 (6th Cir. 2005). "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851 n.11, 102 S.Ct. 2182, 2187 (1982). The Sixth Circuit characterizes the evidentiary burden to prove secondary meaning as "substantial." *Burke-Parsons-Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 596 (6th Cir. 1989) (citing *Bank of Texas v. Commerce Southwest, Inc.*, 741 F.2d 785, 787 (5th Cir.1984)).

Secondary meaning may be demonstrated a number of ways.

In determining whether a particular mark has developed a secondary meaning, a trial court must consider the following factors: (1) duration and manner of usage; (2) effort and expenditure of money toward developing a reputation; (3) survey evidence; (4) sales volume; and (5) extent of advertising expense.

*Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 118 Fed.Appx. 942, 947, 2004 WL 3008778, 5 (6th Cir. 2004). *Burke-Parsons-Bowlby* suggests "the Court must draw reasonable inferences from evidence of long-term usage, from considerable effort and expenditure of money toward developing a reputation and good will for the trademark." 871 F.2d at 596.

Plaintiff cites its duration using the term in Michigan, the amount of money spent on advertising, as well as the results of a secondary meaning study conducted by its expert witness Dr. Eli Seggev. Plaintiff concludes that it has established secondary meaning, and that its mark therefore deserves strong protection. The Court disagrees.

To establish secondary meaning, the duration of a mark's use must be more than "a relatively short period." *See Burke-Parsons-Bowlby Corp.*, 871 F.2d at 596 (citing with approval *WLWC Centers, Inc. v. Winners Corp.*, 563 F.Supp. 717, 723 (M.D.Tenn. 1983), which found three years too short a time period to establish secondary meaning.). Plaintiff's presence in some of the nine county area is much more recent and of much shorter duration than its general presence in Michigan. While Plaintiff's witnesses spoke of its longevity in certain counties, they were referring to the presence of Republic Bank branches. Plaintiff purchased Republic at

the end of 2006, and until that purchase and re-branding, it had no presence as Citizens Bank in Washtenaw, Monroe, or Livingston counties, three of the counties at issue here.

Advertising expenses are at most an indirect indication of secondary meaning, and reflect more of an attempt to establish it. *See Homeowners Group, Inc. v. Home Marketing Specialists, Inc.*, 931 F.2d 1100, 1108 (6th Cir. 1991) ("advertising budgets . . . ha[ve] an attenuated link to actual market recognition . . ."); *Burke-Parsons-Bowlby Corp.*, 871 F.2d at 596 ("Advertising expense . . . will not, standing alone, establish secondary meaning."). Nor will advertising dollars spent to "merely survive" in a market prove secondary meaning. *Burke-Parsons-Bowlby Corp.*, 871 F.2d at 596. While Plaintiff also provided evidence of millions of dollars spent in advertising, an October 2007 report indicated that in the banking industry, it was the number ten spender in Michigan, and number nine in Detroit. That suggests more a "mere survival" level of advertising, not one that would establish reputation and thus, secondary meaning.

Nor do Dr. Seggev's studies establish secondary meaning. The studies investigated whether respondents associated the word "Citizens" in the banking industry with one or more companies, or no company at all.

In his first study of twelve counties in Michigan, fifty-two percent (240 out of 473) of respondents indicated they associated "one company" with the term. The study followed up with "unaided recall" questions, which asked the "one company" respondents for addresses, logos, or other advertising cues to determine which

company they associated with "Citizens."  At most[1] eight per cent answered in a manner that suggested the Plaintiff was the one company.  Put another way, over ninety percent of respondents failed to identify the Plaintiff with the term "Citizens."

Dr. Seggev did a second analysis of the data, of respondents from the nine-county area where Plaintiff is the only "Citizens"-named bank.  The percentage responding that they associated one company was statistically the same.  The second study did not seek to determine which companies were in respondents' minds as the "single source."  Plaintiff argues that because it is the only "Citizens"-named bank in that nine county area, one must logically conclude that it was the "single source" in respondents' minds.[2]

The Court is not persuaded, because the data is simply inconclusive.  It is possible that the portion of respondents indicating Plaintiff as their single source might have increased from the initial study.  However, concluding as the Plaintiff does that although it was on the minds of only a small fraction of respondents in the first study, but all of them in the second, is a leap of logic the Court is not prepared to follow.

Furthermore, if the portion of respondents specifically associating Plaintiff

---

[1]Defendants challenge Dr. Seggev's total number of "un-aided recall" respondents who identified Plaintiff as the single source.  Dr. Seggev apologized on the stand for "missed verifications" of banks outside the counties at issue, some of which referred to banks even outside Michigan, but acknowledged he did not correct those entries in a subsequent supplemental report.

[2]Plaintiff's counsel argued that "we do not know" how respondents in the second analysis would have responded to the unaided recall questions.  Unfortunately for Plaintiff, that is its burden to demonstrate.

with a single source was higher in the second data set, one would expect the proportion of general single source respondents to be higher as well, not statistically the same. This is especially so because the second analysis eliminated nearly twenty-five percent of the original respondents as residing in counties with more than one "Citizens"-named entity.[3]

In addition, the study followed a time period in which Plaintiff had invested significant funds and efforts to become established, especially in Oakland County, whose inhabitants represented one-third of the second analysis's respondents. The fact that the numbers were statistically the same between the two analyses indicates that awareness of Plaintiff's mark is weak.

Furthermore, the eight percent attribution to Plaintiff is insufficient to demonstrate secondary meaning. In *Ashland Oil, Inc. v. Olymco, Inc.*, 1995 WL 499466, 4 (6th Cir. 1995), forty-two percent of a survey group associated a single source with the term "Instant Oil Change." However, as only eight percent associated that source with the term "Valvoline," secondary meaning was not established. *Id*.

Plaintiff cites *Tas-T-Nut Co. v. Variety Nut & Date Co.*, 245 F.2d 3 (6th Cir. 1957) as indicating that it need only prove "single source," and that it need not demonstrate that the actual associated source is known to the consumer. *Id*. at 7 ("To prove secondary meaning in a trade dress, it was not necessary to show that the public knew the personal identity of the [source].") *Tas-T-Nut* is inapposite, as a trade dress

_____

[3]*See* Seggev Decl., Ex. PL 94, 74-76. Of the original 473 respondents (not counting 5 respondents outside the original twelve counties studied), those in Allegan, Macomb, and Kalamazoo were eliminated in Dr. Seggev's second analysis. Those three counties contributed 112 respondents to the original survey.

decision. The intent of *Tas-T-Nut* was to protect parties from "unfair competition . . . [in] the marketing of a product in containers or labels deceptively similar to the first comer's containers or labels which have acquired a secondary meaning." *Id*. The decision continues: "the competitor cannot avoid liability merely by affixing his own name." *Id*.

Here, what is at issue, and what was studied *was* the name, not deceptively similar packaging. Hence, the anonymous source rule does not prevent the need to identify the name of the source in respondents' minds, as revealed by the unaided recall questions.

"Secondary meaning is proved when by a preponderance of the evidence it can be determined that the attitude of the consuming public toward the mark denotes 'a single thing coming from a single source.'" *Burke-Parsons-Bowlby*, 871 F.2d at 596. Plaintiff has not demonstrated secondary meaning to a preponderance.

Admittedly, this conclusion diverges from that of *Citizens Banking Corp. v. CNB*, *supra*, which held that Plaintiff had established secondary meaning. That decision addressed a different geographic region, southwest Michigan, and not the counties at issue here, especially those in which Plaintiff's presence is quite recent. In addition, the court in that case did not have the benefit of Dr. Seggev's surveys.

In conclusion, "the strong mark enjoys greater protection while the weak mark is afforded little support." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) (quoting *Hindu Incense v. Meadows*, 692 F.2d 1048, 1050 (6th Cir.1982)). Because it has not proven secondary meaning for a descriptive term, Plaintiff has not established that its mark is entitled to strong

protection.

## C.  Likelihood of confusion

Even if Plaintiff had established secondary meaning, it has failed to demonstrate likelihood of confusion.  "The touchstone of liability under [the Lanham Act] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997).  The "ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Champions*, 78 F.3d at 1116 (quoting *Homeowners Group, Inc.*, 931 F.2d at 1107).

In this Circuit, the eight-part *Frisch*-factor test is used to evaluate the likelihood of confusion.  Those factors are

> (1) strength of the plaintiff's mark, (2) relatedness of the goods or services, (3) similarity of the marks, (4) evidence of actual confusion, (5) marketing channels used, (6) likely degree of purchaser care, (7) the defendant's intent in selecting its mark, and (8) likelihood of expansion of the product lines.

*General Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006) (citations omitted).  These factors "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Homeowners Group*, 931 F.2d at 1107.

A few factors are either undisputed, or simply not dispositive.  The parties agree that their products and services are related, and that the marketing channels are very similar.  Those factors weigh in the Plaintiff's favor.

Besides finding a low likelihood of confusion, which weighs only slightly in Plaintiff's favor, all other pertinent factors weigh heavily toward Defendants. Those factors are analyzed below.

**(1) The strength of the plaintiff's mark**

The strength of a mark is determined by both distinctiveness and degree of recognition. *Homeowners Group*, 931 F.2d at 1107. Accordingly, the analysis above of distinctiveness and secondary meaning, as well as other factors discussed below, contributes to the Court's conclusion that Plaintiff's mark is weak.

"[C]ourts have found extensive third-party uses of a trademark to substantially weaken the strength of a mark." *Id.* at 1108. Evidence was introduced at trial of the existence of over 300 banks nationwide with "Citizens" in their name, and at least six in Michigan. A Google search the week of trial for the phrase "Citizens Bank" yielded 638,000 "hits."

As to the strength of the term "Citizens" itself, courts have come to different conclusions. The Fifth Circuit characterized it as "very weak, and deserv[ing] little protection." *Citizens Nat. Bank of Meridian v. Citizens Bank of Philadelphia Mississippi*, 35 Fed.Appx. 391, 2002 WL 761301, *2 (5th Cir. 2002). It did so because

> [t]here are 168 registered businesses using 'Citizens' in their names in the state, including seven banking institution. . . . Extensive use of a word, particularly in a similar industry, reduces the likelihood of confusion among consumers and drastically weakens a mark.

*Id.*

The Eastern District decision *Citizens Banking Corp.*, *supra*, found Plaintiff's

mark to be strong "because of plaintiff's extensive advertising and its status as the only Michigan bank using the mark[.]" No. 98-74195, *slip op.* at 10. The Third Circuit upheld a jury verdict that found a "Citizens" mark to be distinctive. *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 123 (3rd Cir. 2004).

The latter decision noted, however, that "as a general rule, widespread use of even a distinctive mark may weaken the mark." *Id.* (citing *Petro Stopping Ctrs., L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 93-94 (4th Cir. 1997)). Similarly, though not directly addressing the use of "Citizens," the Tenth Circuit recognized "the well-established principle that extensive third-party use of the disputed term indicates that the term itself deserves only weak protection." *First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 654 (10th Cir. 1996).

While Plaintiff can demonstrate lengthy use of the term Citizens in the state, at least in the Flint, Michigan, area, it has not been the exclusive user of that name. Six other banks in Michigan, and at least one credit union, use the term "Citizens" as some portion of their name. In addition, Plaintiff's own internal documents indicate low awareness of the mark in its target markets.

On that issue, direct evidence of the lack of recognition of Plaintiff's mark was introduced at trial. On more than one occasion over the last several years, consultants evaluated Plaintiff's mark and recommended changing the name. For instance, a report prepared by Daniel Brian & Associates in 2003 stated that

> Citizens Bank is a name that sounds familiar to most people questioned. However, many people refer to organizations other than the Bank

headquartered in Flint, Michigan.  The name sound [sic] like every other
bank, therefore differentiation will be difficult.

Ex. DX-25, CBC047972.

Plaintiff insists that the 1999 and 2003 studies cited are old news.  However,
a March 2005 report indicated that Plaintiff was not known in Oakland County.  More
recently yet, internal documents from 2007 indicate that Plaintiff still has low name
recognition in the region.  A June 2007 discussion of the headquarter's move to Troy
included the statement "Citizens Bank does not have the brand awareness that other
brands in our footprint have."  The same month, an email written by one of Plaintiff's
employees noted that she had lived in Michigan her whole life, but had not heard of
Plaintiff before her employment there a year before.  A September 2007 document
which summarized both internal and external research concluded that awareness by
non-clients was "low" in Detroit.

Plaintiff cites *Ameritech, Inc. v. American Information Technologies Corp.*, 811
F.2d 960, 967 (6th Cir. 1987), to demonstrate that a mark's strength may be evaluated,
and found deserving of protection, in a limited geographical area.  However,
*Ameritech* still requires proof of the likelihood of confusion. *Id*.

Plaintiff's own studies and internal discussions support the conclusion that its
mark is weak.  Considering as well the widespread use of "Citizens" in the banking
and finance industries,  the Court concludes Plaintiff's mark merits only weak
protection.

**(3) Similarity of the marks**

The issue of strength or weakness of the mark is a consideration in the

assessment of similarity between marks. *Freedom Sav. and Loan Ass'n v. Way*, 757 F.2d 1176 (11th Cir. 1985) held that

> the use of an identical word, even a dominant word, does not automatically mean that two marks are similar. . . . Since in this case the primary word ["Freedom"] was weakly protected to begin with, *minor alterations could effectively negate any confusing similarity* between the two.

*Id*. at 1183 (emphasis added) (citing *Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Association*, 651 F.2d 311, 316 (5th Cir. 1981)). *Accord First Sav. Bank, F.S.B. v. First Bank System, Inc.*, 101 F.3d 645, 655 (10th Cir. 1996). Here, the differences between the marks are more than sufficient to distinguish them.

Similarity of marks is accorded "considerable weight" in a *Frisch*-factor analysis. *Daddy's Junky Music*, 109 F.3d at 283. *Daddy's* states that the test is not a side-by-side look in the courtroom, but that "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Id*. (citation omitted). Further, courts must determine whether the marks are potentially confusing when viewed individually or "singly" by consumers, that is, without an opportunity to compare to the competing mark. *Id*.

*Daddy's Junky Music* counsels the Court to view the marks in their entirety. Clearly, Plaintiff's red "weatherball" serves to distinguish its Citizens banks from others. Internal correspondence characterized it as "our golden arches." Plaintiff's CEO Hartman stated that the red ball was immediately adjacent to "Citizens Bank" "99 per cent of the time."

A March 2007 40-page internal publication called "Brand Identification

Standards" gave Plaintiff's employees guidance on the appropriate use of the logos. It specified font (or typography), the color palette, and placement and sizing of the logo. In only one application area (business reply and courtesy reply envelopes) were employees instructed *not* to use the weatherball with "Citizens Bank."

Numerous exhibits of both parties' logos, in building signage, brochures, and other advertising were offered at trial. Having viewed the marks "in their entirety and focus[ing] on their overall impressions," as *Daddy's Junky Music*, *supra*, counsels, the Court finds the marks to be distinguishable.

While in general the focus is not to be on "individual features," only "minor alternations" are necessary to distinguish a weak mark from its competitors. A discussion of features is thus unavoidable. The differences between these two marks here are much more than minor. Plaintiff's mark includes a red weatherball that is large in relation to the phrase "Citizens Bank," and brighter than the gray font used for the text. By contrast, Defendants' mark uses a logo (the "daisy wheel") that is the same height as the corresponding text. The fonts are different; the colors are different (Defendants use blue and/or green); and the terms are different ("Citizens Bank" and "RBS Citizens").

Plaintiff's arguments in the Ohio market counterclaim support the Court's conclusion on similarity. In that case, Plaintiff's counsel argued that two marks which contain the *same* name ("Citizens Bank") in different fonts, and preceded by a single identifying logo (Plaintiff's "weather ball," and Defendants' "PacMan" or "snowflake" marks), are *not* similar. *See* Transcr. May 4, 2007, hearing, 57 (asserting that the weatherball and Defendants' "check mark" or "C logo" were not "confusingly

similar."). The marks here are much more dissimilar, as they are distinguished not only by logo, color, and proportion, but by the preceding term "RBS."

As to the similarity of the names, the parties dispute whether and how consumers shorten bank names. Plaintiff cites news articles referring to it and competitors (including Defendant) solely as "Citizens." Its expert Dr. Bamossy also raised a study in which Pittsburgh area bank consumers were asked to name their banks. The study found that many people drop a portion of banks' names.

Defendants' expert Dr. Dwight Crane disagreed with Plaintiff's projection that "RBS Citizens" would be shortened to "Citizens." He observed that no evidence was offered to show that the first portion of a name (as here, "RBS") is typically dropped. Instead, consumers retain enough of a bank's name to identify the one they use.

The Court finds that consumers are not likely to shorten "RBS Citizens" to "Citizens." Regardless, other attributes of the marks make them sufficiently dissimilar as to "negate any confusing similarity." This factor of "considerable weight" weighs in Defendants' favor.

**(4) Evidence of actual confusion**

As Defendant has not yet begun to operate under "RBS Citizens," only very limited actual confusion data is available. However, while proof of actual confusion is "often deemed the best evidence of possible future confusion," it is not considered essential. *Id.* (citing *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 40 (1st Cir.2006)). "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion, or consumer surveys." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381

F.3d 477, 486 (5th Cir. 2004) (citations omitted). The holder of a trademark need only demonstrate likelihood of confusion, not actual confusion. *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112,120 -121 (1st Cir. 2006).

Plaintiff's expert, Dr. Bamossy, executed four surveys, and analyzed 22 reported incidents of actual confusion. Defendants challenge the validity of those surveys. "It is the trial court's responsibility to determine the probative value of a consumer survey, and it is appropriate for the trial court to accord little or no weight to a defective survey." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 518–19 (citing *Ashland Oil, Inc.*, 1995 WL 499466 at *4).

In general, the appropriate resolution for a flawed survey is to address its weight and credibility, and not to exclude it. *Id.* at 786; *accord, J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1463–64 (Fed. Cir. 1991) ("Although we agree with [Plaintiff] that the survey was not perfect in its content and execution, it is admissible and given appropriate weight."). The surveys here were highly flawed, and accordingly, are afforded minimal weight.

The most significant error was the choice of control variable. Described by Dr. Bamossy as a "naturally occuring control variable" the term "CHASE" bears very little resemblance to the marks at issue, in contrast to the guidance on which Dr. Bamossy said he relied. *See* J. Jacoby, Experimental Design and the Selection of Controls in Trademark and Deceptive Advertising Surveys, 92 Trademark Rep. 890, 919-22 (2002). "In designing a control group study, the expert should select a stimulus for the control group that shares *as many characteristics with the control group as possible*, with the key exception of the characteristic whose influence is

being assessed." *Id*. at 920 (quoting the Federal Judicial Center's Reference Manual on Scientific Evidence) (emphasis added).

Dr. Bamossy admitted on the stand at trial that a bad control selection could invalidate a survey. Evidence was also admitted that Chase holds a five times larger share of market deposits in this region than Plaintiff. Dr. Bamossy acknowledged that one would not want "the 800 pound gorilla" – a bank whose market share and name recognition exceeded the Plaintiff's – as the survey's control. Dr. Bamossy's surveys did not ask whether respondents had accounts at Chase.

Another flaw in Dr. Bamossy's survey was the misuse of Plaintiff's logo. Plaintiff's standards manual indicates the weatherball is proportionately larger than its accompanying text. The survey's use of the mark presented it as the same size as the text, with the result that the weatherball's appearance was much diminished.

Dr. Bamossy also analyzed 22 incidents of actual confusion logged between Plaintiff's and Defendants' banks. The analysis broke the incidents into several categories, of which three were "Directory assistance," "Phone book," and "Calling a local branch by phone." Currently, the name Defendants use outside of Michigan is "Citizens Bank," so this confusion is to be expected. However, at issue in this action is Defendants' rebranding as "RBS Citizens." This name would not follow or proceed Plaintiff's phone listing. Therefore, many of the reports of actual confusion (which was a very small number to begin with) are not pertinent.

The Court finds Plaintiff has not demonstrated likelihood of actual confusion.

**(6) Likely degree of purchaser care**

On this disputed point, the Court finds more persuasive the testimony of

Defendant's witness Dr. Dwight Crane. Dr. Crane testified as an expert in the business and marketing of banking and financial services. He observed that most consumers do not change banks frequently. This point was corroborated by Plaintiff CEO Hartman.

The median duration of a consumer's relationship with a bank is ten years. Typically, consumers change banks only when they move, or when they are very unhappy with their bank's services. When they do select a new bank, they conduct fact-gathering before making a decision, because of the high cost of a wrong decision (for instance, paying too much for a mortgage).

Dr Crane's testimony was further corroborated by Plaintiff's expert, Dr. Bamossy. In a textbook on the subject, Dr. Bamossy wrote that financial services are an example of infrequent purchases, on which consumers perform extensive data gathering to evaluate their alternatives.

Dr. Crane also testified to the sophistication of commercial customers. They also take great care in evaluating a bank and its services. Accordingly, the degree of purchaser care is high. This factor weighs in Defendants' favor.

**(7) Defendants' intent in selecting its mark**

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *General Motors Corp. v. Keystone Automotive Industries, Inc*., 453 F.3d 351, 357 (6th Cir. 2006) (quoting *Homeowners Group, Inc.*, 931 F.2d at 1111). *Daddy's Junky Music Stores, Inc.*, observed that alleged infringer's intent in selecting a mark is relevant, because "purposeful copying" indicates a belief on its part that such imitation may divert

business from the senior user.  109 F.3d at 286.

Here, Defendants' witnesses testified consistently and credibly as to their motivation for selecting their new mark and re-branding the entire footprint to reflect both RBS and Citizens Financial Group.  They plan to do this with the new mark "RBS Citizens" and daisy wheel logo.  In addition, their testimony made clear that they seek to differentiate their banks and services from others, and work to avoid confusion in the marketplace.

Allan Watt, head of Group Brand Communications for Defendant RBS, emphasized the brand's intent to "be different" and to "stand out from the crowd."  He also discussed the business intent behind the re-branding effort, as did CEO of Defendant Charter One, Sandra Pierce.

Defendants' Chief Marketing Officer and Group Executive Vice President Theresa McLaughlin testified that her job was to "build a differentiating brand that is consistent across our franchise around the Citizens Bank name . . ."  She explained that differentiation requires creating a brand that stands out from the competition.

Finally, excerpts of the deposition of Barbara Reilly, managing partner of Arnold Worldwide were shown.  Arnold provides services to Defendants Citizens Financial Group and Charter One in the areas of marketing plans, strategic development, brand positioning, and business analysis.  Reilly testified that her agency's job was to "position our brands for our clients in a way that allows them the most separation . . . . [W]e do a really good job of it so there isn't any confusion."  She emphasized further that they "provide separation in brand identity."  In sum, Reilly stated that

if . . . Arnold does its job the way Arnold is trained at doing its job, I have never been worried about going into a marketplace and being clear that we deliver separation and create brand identity.

The Court finds Defendants intent in selecting the mark at issue was not to create confusion.

## D. Criteria for a permanent injunction

According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S.Ct. 1837, 1839 (2006).

Here, based on the likelihood of confusion analysis, Plaintiff has not demonstrated the first criteria, that it has suffered irreparable injury (or that such is imminent). Furthermore, in the absence of finding confusion, the public interest is not served by an injunction, because a finding of no confusion provides no basis to find the public's interest.

In addition to finding no likelihood of confusion, the Court holds that any harm to Plaintiff is in the realm of minor annoyance, which is does not rise to the level of actual injury. As noted in *Cinnabar Traders Ltd. v. Cinnabar Lane Ltd.*, 223 U.S.P.Q. 726 (S.D.N.Y.1983),

[t]here has been no showing of actual confusion as to products. The only evidence of confusion is a few misdirected telephone calls, but this is a minor annoyance of business life. There has been no showing of injury

to plaintiff from loss of business or the like.

*Id.* at 728.

Defense witness Dr. Crane provided examples of confusion to distinguish which would cause business injury, and which minor annoyance. Confusion causing an error in a purchase decision, such as the selection of a bank, applying for a loan, or deciding on a specific bank's certificate of deposit would be the higher level of injury. Confusion in individual transactions, such as a consumer's use of the "wrong" ATM, resulting in a charge a consumer does not expect, or entering the wrong bank to cash a check, is more in the realm of minor annoyance. The majority of the incidents captured by Plaintiff's "confusion log" indicate only minor annoyance has typically resulted from name confusion.

In addition, injunctive relief is an equitable remedy. As such, it requires that a party come to the Court with clean hands. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995). "[T]he doctrine is to be applied only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation."*Id.* (citations omitted). In trademark litigation, injury to the defendant need not be shown. Thomas J. McCarthy, 6 McCarthy on Trademarks and Unfair Competition § 31:47 ("[I]njury to the public is sufficient . . .") (citing *National Football League v. Governor of State of Del.*,435 F.Supp. 1372, 1391 n.35 (D.Del. 1977).

Here, Plaintiff has on more than one occasion done the same thing it seeks to prevent Defendants from doing: entering a market in which other "Citizens"-named banks are currently operating. Plaintiff entered Macomb County, Michigan, in 1995,

as "Citizens Bank," knowing the risk of potential confusion due to the presence there of branches of Citizens State Bank.

When Plaintiff purchased F&M bank, it similarly re-branded its banks in the Wisconsin market, despite being requested by a Citizens State Bank there not to do so. Plaintiff CEO Hartman testified that they proceeded with that re-branding, despite knowing that it would cause confusion. Existing F&M branches near other "Citizens"-named banks, such as Citizens Bank of Mukwango and First Citizens State Bank, were also re-branded.

Plaintiff also adopted a tagline very similar to Defendants'. According to Hartman, it began to use the tagline "Let's make it happen," in approximately 2003. It did so at the suggestion of a consultant. Hartman did not remember discussions before adopting the tagline that the phrase "Make it happen" was already in use by Defendant since 2001 or 2002.

Because Plaintiff has not proven any likelihood of confusion nor any imment injury that requires redress by injunctive relief, and because of its own conduct knowingly creating confusion in entering new markets, the Court finds that Plaintiff is not entitled to injunctive relief.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiff's request for a permanent injunction. The Court's denial is conditioned on Defendant's compliance with its plan for re-branding the Charter One banks. That is, that the color scheme be only blue and green (and not red), that the brand be known as "RBS Citizens," that the mark include the use of the "daisy wheel" or "snowflake" design, and that the roll-out

of the rebranding be accompanied by a consumer education effort.

       IT IS HEREBY ORDERED that Plaintiff's prayer for an injunction against Defendant's use of "Citizens" is DENIED.

       SO ORDERED.


       S/ARTHUR J. TARNOW
       Arthur J. Tarnow
       United States District Judge

Dated: May 6, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 6, 2008, by electronic and/or ordinary mail.

       S/THERESA E. TAYLOR
       Case Manager